**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **Lisa Fernandes,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil No. 4:21-CV-40124-MRG** |
| ) | |
| **Criterion Child Enrichment, Inc.,** ) | |
| ) | |
| **Defendant.** ) | |

_____

<u>**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 26)**</u>

**GUZMAN, J.**

  Plaintiff Lisa Fernandes ("Fernandes") is a former employee of Defendant Criterion Child Enrichment, Inc. ("Criterion") and brings claims of disability discrimination, interference and retaliation for exercising her rights protected under Mass. Gen. Laws ch. 151B, Mass. Gen. Laws ch. 152 § 75B, and the Americans with Disabilities Act ("ADA"). She further claims she is entitled to unpaid wages pursuant to the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148. [Compl. at 2, ECF No. 1-3].[1] Fernandes filed her original complaint in Worcester Superior Court on October 13, 2021, and Criterion removed the case to this Court on December 3, 2021 under federal question jurisdiction. [ECF No. 1; Compl.]. Criterion moved for summary judgment on November 7, 2023. [ECF No. 26]. This Court held a hearing on the motion on April 25, 2024, taking the motion under advisement. [ECF No. 39]. For the reasons stated below, the Court **<u>GRANTS</u>** summary judgment in favor of Criterion on all counts.

---

[1] Page numbers will refer to the PACER pagination unless otherwise noted.

## I.     BACKGROUND

### 1.  Fernandes' Requests for Accommodations

Fernandes was employed by childcare agency, Criterion, from 2007 until 2020 as a "Teaching Assistant." [Compl. ¶¶ 4-6].[2] Her responsibilities included, in relevant part, assisting children with diapering and toileting as specified in agency procedure; assisting in maintenance and upkeep of toys, equipment, classrooms, and bathroom space; assisting in other program-related activities such as field trips, parties, and family events; and providing assistance to individuals with disabilities who require assistance for program access. [Pl. Resp. CSMF ¶ 4, ECF No. 31]. On September 22, 2017, Fernandes injured her back when she lifted a child as part of her duties. [Compl. ¶ 11]. Fernandes reports that her injury causes her pain, including muscle aches, cramps, and muscle fatigue. [Pl. Opp. at 2, ECF No. 30]. As a result of her injury and prolonged symptoms, Fernandes requested accommodations a total of four times in 2017, with Criterion granting two accommodations as requested and denying two.

Fernandes first requested an accommodation of a one-week lifting restriction on September 27, 2017, which Criterion granted her. [Pl. Resp. CSMF ¶¶ 12-13]. Shortly thereafter, Fernandes filed for workers' compensation benefits to assist in her recovery as a result of her workplace injury. [Id. ¶ 14; Tab 3, L. Fernandes Dep., Vol. II 61:7-9, ECF No. 28-6]. Approximately two weeks after the restriction ended, on or about October 10, 2017, Fernandes presented human resources with a second accommodation request in the form of a doctor's note stating that she shall return to work but with a restriction of no lifting for one month from the date of return. [Pl. Resp. CSMF ¶ 16]. Fernandes' supervisor, Margaret Finnegan, in her capacity as Program Director, informed Fernandes that Criterion could not grant that second accommodation request as it would

---

[2] There was a break in employment when Fernandes was temporarily terminated then rehired in 2008. [Compl. ¶ 5].

"prevent [her] from performing virtually any of her duties as a Teaching Assistant." [Id. ¶ 17]. Fernandes then obtained a revised doctor's note recommending a lifting restriction of 10 pounds for one month starting September 27, 2027. [Id. ¶ 18]. Criterion agreed to accommodate the clarified third restriction. [Id. ¶ 19] Subsequently, on October 27, 2017, Fernandes submitted a fourth doctor's note stating that she needed another one-month accommodation that would restrict her to desk work, prevent her from bending or stooping, and limit her lifting capacity to ten pounds. [Id. ¶ 21].  Further, Criterion would be required to permit Fernandes to sit and stand whenever needed. [Id.]. As with her second request, Criterion denied this request, stating in an internal email, "[I]t has been challenging for us to accommodate the restrictions she had previously, and the new note lists even more restrictions. I do not feel we can accommodate these restrictions in the role [Fernandes] is in." [Id. ¶ 22]. Fernandes disputes the reason for Criterion's denial, asserts that the denial was motivated by illegitimate reasons, and asserts that the question of Criterion's motivation for the accommodation denial is one for the jury. [Id.]

In response to the fourth request, Criterion came back to Fernandes with an alternative offer of a one-month FMLA leave of absence, which Fernandes asserts was presented as her only alternative. [Id. ¶ 23]. Approximately a week before Fernandes was due to return to work, she provided Criterion with a doctor's note clearing her to return with no restrictions starting on November 20, 2017. [Id. ¶ 24]. Fernandes did not request another accommodation again after October 17, 2017. [Id. ¶ 25]. Furthermore, Fernandes, clarified to a supervisor that she had no lifting restrictions that would prevent her from carrying out all her duties and did not require any accommodations when asked in March 2019. [Id. ¶¶ 26-29].

**2.  <u>Criterion's Covid-19 Protocol & Fernandes' Termination</u>**

In June 2020, months into the Covid-19 pandemic, Criterion created a Covid-19 protocol and tested their employees' understanding of it through a training and follow-up quiz ahead of their return to the workplace. [Id. ¶¶ 31, 35]. That protocol required all employees to self-screen and fill out a "Self-Screening Checklist" before entering the worksite where they would report symptoms of Covid-19 (whether or not they believed any symptoms were related to Covid-19) and if they or anyone in their household were experiencing Covid symptoms or had received a positive Covid-19 test.[3] [Id. ¶¶ 31, 32; ECF No. 28-20 at 2]. The self-screening checklist also asked employees to report if they or anyone else in their household had been in close contact with anyone Covid-19 positive or presumed to be Covid-19 positive in the past fourteen days. [ECF No. 28-20]. Criterion further required employees to complete and sign a daily log that confirmed their review and completion of the self-screen and to record all their entries and departures to the worksite for the day, as well as the areas of the office that they used. [Pl. Resp. CSMF ¶ 34]. The training included a true or false quiz question on whether "it is okay to come to the office" if the employee is experiencing a symptom of Covid-19, even if they believe it was unrelated to Covid-19. [Id. ¶ 38]. Fernandes completed the training and the quiz testing her comprehension. [Id. ¶¶ 35, 38]. In her deposition, Fernandes testified that she understood at the time of the training that Criterion's Covid-19 protocol instructed her not to come to work when experiencing a symptom of Covid-19 regardless of whether she believed the symptom was unrelated to Covid. [Tab 3, L. Fernandes Dep., Vol. II 27:4-9].

On July 29, 2020, another Criterion employee, Maria Rojas ("Rojas") informed Criterion that she was a close contact to someone who she learned had tested positive for Covid-19. [Pl.

---

[3] The self-screening checklist required disclosure for any of these symptoms: "fever or chills, cough, sore throat, shortness of breath, congestion, gastrointestinal symptoms (nausea, vomiting, diarrhea), fatigue, headache, new loss of smell or taste, new muscle or body aches." [Pl. Resp. CSMF ¶ 33].

Resp. CSMF ¶ 39; Finnegan Aff ¶ 3, ECF No. 28-2]. In her complaint, Fernandes asserts that Rojas informed her on July 29, 2020 that Rojas' two children, which whom she shared a household, had Covid-19. [Compl. ¶ 32]. In her opposition memorandum, Fernandes states that Rojas found out her sons had tested positive for the virus after she was already at work. [Pl. Opp. At 10, ECF No. 30]. Fernandes alleges that she observed Rojas at work for her entire shift on July 29, 2020. [Compl. ¶ 31]. Criterion instructed Rojas to stay home for fourteen days and quarantine, which she did. [Finnegan Aff. ¶ 3, ECF No. 28-2]. While Fernandes pleads "upon information and belief" that Rojas falsified her self-screening checklist, by stating "no" on the question regarding whether a member of her household had tested positive for Covid-19, in the summary judgment record, Criterion states that it has no information to suggest that Ms. Rojas ever submitted false information to management concerning her checklist. [Comp. ¶ 33; Finnegan Aff. ¶ 9]. Both parties agree that Rojas did not report having Covid herself. [Compl. ¶ 34; Finnegan Aff. ¶¶ 6-7]. Fernandes requested a Covid-19 test from her doctor on July 31, 2020, and states she sought the test as a result of her contact with Rojas. [Compl. ¶¶ 34, 36]. The test was administered on August 1, 2020. [ECF No. 28-28 at 10].

On August 1, 2020, Fernandes went to an urgent care facility "mainly for [a] sore throat and mainly for [her] back." [Tab 3, L. Fernandes Dep., Vol. II 46:9-14; Pl. Resp. CSMF ¶ 40]. Notes in the medical record from a follow-up visit on August, 24, 2020 state, "on August 1 [Fernandes] had a [Covid-19] test done as she was having symptoms and was in contact with a coworker who[se] son had tested positive." [ECF No. 28-28 at 10].[4] At the August 1, 2020 urgent care visit, the provider asked if Fernandes experienced any new onset symptoms and Fernandes

---

[4] Fernandes disagrees with the provider's recorded reason for her taking the test, as well as with the admissibility of the record itself and Criterion's ability to rely on it.  [Pl. Resp. CSMF ¶ 41]. For a discussion of this argument, see the section of this order titled, "Evidentiary Objections," *infra*.

answered, "a little" to sore throat, "yes, about a week" to diarrhea, "a rash to side of foot", and "aches in bilateral legs… for about a week, getting worse." [ECF No. 28-26 at 11]. The visit notes indicate that Fernandes also referred to symptoms she attributes to her chronic back injury that was the subject of her workers' compensation claim, namely, back pain and pain in her legs and thighs. [Id. at 12]. However, the Court notes that Fernandes also reported the new symptoms listed above, which are known symptoms of Covid-19, not generally associated with back pain (i.e. the sore throat, gastrointestinal issues, and rash on feet). The Criterion Covid-19 self-screening checklist that Fernandes was required to fill out daily listed sore throat, gastrointestinal symptoms (including diarrhea), fatigue, new muscle or body aches, and any other sign of illness as symptoms of Covid-19. [ECF No. 28-20].

When Fernandes appeared to work from July 27 to July 31, 2020, she reported on her self-screening checklist that she was not experiencing the new onset of symptoms that she reported to her urgent care provider as having had for at least a week before August 1, 2020. [Tab 3, L. Fernandes Dep., Vol. II 27:10-28:18; Pl. Resp. CSMF at ¶¶ 50-51]. On August 3, 2020, Fernandes came into work while awaiting the result of the August 1, 2020 Covid test and reported no symptoms on the self-screening checklist. [Pl. Resp. CSMF ¶ 56]. While at work that day, Fernandes received a phone call from her physician informing her that she had tested positive for Covid-19 and would need to quarantine.[5] [Id. ¶ 57]. Fernandes informed her manager of her positive Covid-19 test and left work to quarantine for fourteen days. [Compl. ¶¶ 39-40].

On August 4, 2020, Shawna Jones, a human resources generalist working on behalf of Criterion, called Fernandes to obtain more information for contact-tracing purposes. [Pl. Resp.

_____

[5] Fernandes states that her doctor did not instruct her to quarantine after the August 1, 2020 visit, but rather only after he called her with the test results the following Monday. [Ex. 1, Fernandes Dep. Vol. I at 65:6-11, ECF No. 31-1].

CSMF ¶ 58]. In an email summarizing their conversation, Jones wrote that Fernandes told her that she had begun to feel fatigue and body aches at the beginning of the previous week. [ECF No. 28-29]. Fernandes disputes that Jones accurately recorded the contents of the phone call and asserts that the fatigue Fernandes experienced was a chronic issue related to her back injury rather than Covid-19. [Pl. Resp. CSMF ¶ 59]. Both parties agree that Criterion was aware that Fernandes had been to the doctor recently regarding her symptoms. [Pl. Resp. CSMF (P.'s Statement of Additional Material Facts) ¶¶ 41-42; Jones Dep. 40:21-24, ECF No. 31-9; Finnegan Dep. 149:6-13, ECF No. 28-30]. Additionally, both Fernandes' deposition testimony as well as Jones' provide support that Fernandes told Jones she believed her symptoms were chronic rather than new, but that Jones included them as non-reported Covid-19 symptoms. [Pl. Resp. CSMF (P.'s Statement of Additional Material Facts) ¶ 40; Jones Dep. 50:22-53:13]. The parties dispute the reason why Jones decided to characterize Fernandes' symptoms as she did. Regardless of what exactly was said on that call between Jones and Fernandes,[6] Criterion began contact tracing which employees might have been exposed to Covid-19 by close contact with Fernandes so that those employees could be instructed to quarantine. [Pl. Resp. CSMF ¶ 60]. Criterion concluded most employees may have been close contacts to Fernandes and decided to close the facility for fourteen days. [Id. ¶¶ 60-61; Tab 25, Finnegan Dep. 137:14-17]. Fernandes submits that she did not "cause" Criterion to shut down, pointing out that Rojas had also already been instructed to quarantine due to her close contact with a family member who had Covid-19. [Pl. Resp. CSMF ¶ 60]. Rather, Fernandes asserts, "the Covid-19 virus, and not Fernandes, . . . caused the shutdown of the facility." [Id.]

Once she was cleared by her doctor to return to work, on August 21, 2020, Fernandes met with a Criterion supervisor, Maya Murphy, who informed Fernandes that she had been terminated.

---

[6] As will be discussed in Section III.1 on Count I, the Court finds that any testimonial evidence of what either Fernandes or Jones said on the call is inadmissible hearsay.

[Id. ¶ 63]. Criterion's stated reason for Fernandes' termination was that Fernandes failed to comply with the COVID-19 Protocol, provided false information on the COVID-19 self-screening attestation, and demonstrated a lack of judgment in endangering other staff by entering the worksite while awaiting the results of a COVID-19 test and exhibiting symptoms. [Id. ¶ 64]. Fernandes disputes this rationale and alleges her termination was retaliation for her filing for workman's compensation benefits and seeking accommodations for her back injury, and that in terminating her, Criterion was discriminating against her based on her disability. [See Compl.].

### 3. Fernandes' Workers' Compensation Claim

As stated, shortly after her injury in September 2017, Fernandes filed for workers' compensation ("workers' comp.") benefits. [Pl. Resp. CSMF ¶ 14]. Criterion was aware of Fernandes' claim, and Fernandes herself testified that no one at Criterion ever raised any issues with her for having filed for workers' comp. [Tab 3, L. Fernandes Dep., Vol. II 61:3-5]. In May 2020, Finnegan exchanged emails with a human resources employee inquiring on behalf of an insurance adjuster regarding Fernandes' workers' comp. claim and whether she reported a new injury in April 2020. [Pl. Reply at 19-20, ECF No. 34]. In July 2020, Fernandes texted Finnegan twice, first to tell Finnegan that she had a doctor's appointment regarding her workers' comp. claim, and second to tell Finnegan that she "had to go to court." [Pl. Resp. CSMF (P.'s Statement of Additional Material Facts ¶ 14-15)]. On the second occasion, Fernandes did not mention that the court appointment was related to her workers' comp. claim. As of Fernandes' termination, her workers' comp. claim was still active. [Id. ¶ 58]. In her deposition, Fernandes testified that she does not believe she was fired for filing workers' comp. benefits: "if they wanted to [fire me for filings for workers' comp benefits], they -- they would have done that right when this happened. They wouldn't have waited three years later to do it." [Tab 3, L. Fernandes Dep., Vol. II 62:9-14].

### 4. **Fernandes' Sick Time**

Fernandes also asserts that Criterion violated the Massachusetts Wage Act by failing to pay out her accrued sick time, which she alleges consisted of 80 hours of unused time. [Compl. ¶¶ 54-56]. Criterion has a policy of paying out accrued sick time in excess of 80 hours; however, the payout usually occurs at the close of its fiscal year, not upon termination. [D. Mem. at 21, ECF No. 27]. When confronted with her earnings statement for the relevant time period, Fernandes does not dispute that she did in fact receive a sick time payout of $678.21, which amounts to 47 hours of unused time. [Pl. Resp. CSMF ¶¶ 67-68]. Instead, she asserts for the first time in her opposition memorandum that Criterion paid her sick time late. [Pl. Opp. at 9].

## II. **LEGAL STANDARD**

### 1. **Summary Judgment**

A court may grant summary judgment when, making all inferences in favor of the nonmoving party, the evidence in the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Gattineri v. Wynn MA, LLC, 63 F.4th 71, 84 (1st Cir. 2023) (quoting Fed. R. Civ. P. 56(a)). "An issue is 'genuine' when a rational factfinder could resolve it either direction." Mu v. Omni Hotels Mgmt. Corp., 882 F.3d 1, 5 (1st Cir. 2018) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 4 (1st Cir. 2010)). "A fact is 'material' when its (non)existence could change a case's outcome." Mu, 882 F.3d at 5 (quoting Borges, 605 F.3d at 5). If a properly supported summary judgment motion is presented, the nonmoving party must then "set forth specific facts showing that there is a genuine [dispute] for trial," and may not simply "rest upon mere allegation or denials of [their] pleading," but must instead "present affirmative evidence." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 256-57 (1986). To survive summary judgment, the nonmoving party must provide evidence

that is "significantly probative" and more than "merely colorable." <u>Anderson</u>, 477 U.S. at 249, 264. "Neither party may rely on conclusory allegations or unsubstantiated denials, but must identify specific facts derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." <u>Magee v. United States</u>, 121 F.3d 1, 3 (1st Cir. 1997) (citing Fed. R. Civ. P. 56(c) & (e)).

While summary judgment in disparate treatment discrimination cases is generally a "disfavored remedy . . . because the ultimate issue of discriminatory intent is a factual question," <u>Bulwer v. Mount Auburn Hosp.</u>, 46 N.E.3d 24, 39 (Mass. 2016) (quoting <u>Blare v. Husky Injection Molding Sys. Boston, Inc.</u>, 646 N.E.2d 111, 114 (Mass. 1995), courts have granted summary in cases where plaintiffs fail to proffer sufficient evidence of discriminatory animus. <u>See, e.g.</u>, <u>Lee v. Howard Hughes Med. Inst.</u>, 607 F. Supp. 3d 52, 65 (D. Mass. 2022), <u>appeal dismissed</u>, No. 22-1540, 2023 WL 4544477 (1st Cir. Feb. 8, 2023) (entering summary judgment on a disparate treatment claim where plaintiff's evidence for discriminatory nonrenewal consisted of "speculation about the influence of bias" which was "without more, insufficient to survive summary judgment"). Further, it is not the role of the Court to "substit[ute] judicial judgments for the business judgments of employers." <u>Arroyo-Audifred v. Verizon Wireless, Inc.</u>, 527 F.3d 215, 221 (1st Cir. 2008) (quoting <u>Bennett v. Saint-Gobain Corp.</u>, 507 F.3d 23, 32 (1st Cir. 2007)). Ultimately, it is Fernandes' burden to establish a genuine issue of material fact that Criterion's "justification is pretextual and the firm's action was, in fact, improperly motivated by discrimination." <u>Ray v. Ropes & Gray LLP</u>, 799 F.3d 99, 113 (1st Cir. 2015) (citation omitted).

### 1. <u>Evidentiary Objections</u>

The Court notes that Fernandes qualifies many of the statements from the Defendant's concise statement of facts by contesting that the evidence asserted is inadmissible. For example,

for any statement referring to Fernandes' medical records from her emergency room visit, she writes, "It is undisputed that the medical record shows that Fernandes was asked those questions and that it recorded answers to those questions. It is disputed that those answers were an accurate representation of Fernandes's statements at that time. Further, they are inadmissible hearsay and cannot be used to support a motion for summary judgment." [Pl. Resp. CSMF ¶¶ 41, 42, 45, 49].

Regarding the Covid-19 training and quiz, Fernandes raises arguments that the Covid-19 training PowerPoint (Tab 19) and her responses to the training quiz (Tab 19A) are not properly authenticated. [See e.g., Pl. Resp. CSMF ¶ 38 ("It is undisputed that Fernandes underwent a training prior to Covid-19 before returning to work in person. It is disputed that the documents at Tab 19 and 19A are representative of the training Fernandes participated in, reflect her answers, or demonstrate any connection to her"); id. ¶ 36 ("There is also no evidence in the record that the document at Tab 19 is the same training that Fernandes took)].

On the admissibility of medical records, Fernandes' argument fails. While the Court may only consider admissible evidence at summary judgment, statements made for medical diagnosis or treatment are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness. Fed. R. Evid. 803(4). While such statements are not generally admissible to assign fault, if the statements (A) are made for — and are reasonably pertinent to — medical diagnosis or treatment; and (B) describe medical history; past or present symptoms or sensations; their inception; or their general cause, the statement is likely admissible. See Connearney v. Miss Shauna, LLC, No. 11-11686-GAO, 2014 U.S. Dist. LEXIS 31201, at *5-6 (D. Mass. Mar. 11, 2014); Fed. R. Evid. 803(4). The medical records at issue detail the questions Fernandes was asked at her visits to an urgent care facility on August 1, 2020 and August 24, 2020, as well as Fernandes' responses, as recorded by a medical staff member. [Pl. Resp. CSMF ¶¶ 40-43, 45-46, 49]. These

statements clearly meet the requirements of Rule 803(4).

Criterion submits the medical records statements to support the following: that Fernandes was asked whether she had a "new onset" of any of the following symptoms of COVID-19: fever, cough, shortness of breath, sore throat, muscle ache, diarrhea, nausea/vomiting, congestion/runny nose, loss of taste or smell, rash on toes or fingers; that Fernandes answered affirmatively to four of the ten symptoms; that Fernandes reported a new onset of a sore throat, diarrhea (for about a week), and a rash on the side of her foot – with the appointment occurring *before* Fernandes reported to work on August 3, 2020, the same day she received her positive COVID-19 test result. [Id. ¶¶ 41, 42, 45]. Besides asserting her invalid hearsay objection, Fernandes states that the medical notes contradict her deposition testimony that she did not have those symptoms at the time. [See id.] The Court does not find Fernandes' deposition testimony that she was not experiencing any symptoms of Covid-19 from July 27, 2020 – July 30, 2020 and August 3, 2020 credible, especially in light of her other deposition testimony where she testified that she is truthful "all the time" in what she reports to her medical providers and stated, "I'm not going to go up to a -- a medical provider and say I'm having these symptoms if I'm not." [Tab 3, L. Fernandes Dep., Vol. II 28:24-29:4, 49:9-11]. Her contradictory statements plus the contemporaneous recordings of a medical provider with whom Fernandes concedes she was truthful together call for the inference that Fernandes did indeed make those statements and Criterion may use those facts in support of its motion.

On the issue of the Covid-19 training PowerPoint and quiz (Tabs 19 and 19A ([ECF No. 28-22; ECF No. 28-23]), the Court acknowledges that Fernandes raises valid issues with the documents, such as an absence of proof on the face of the documents that they are in fact the same training and quiz results that Criterion utilized. However, like with the medical records objections,

Fernandes' own statements in depositions controvert her assertions that, at a minimum, the training was not the one she took at Criterion. Federal Rule of Civil Procedure 56 governs summary judgment, and, while the rule previously required that documents submitted with a summary judgment motion must be authenticated and attached to an affidavit, the rule was amended in 2010 and "now requires a party asserting a fact to support it by 'citing to particular parts of materials in the record,' such as depositions." Nasir v. Town of Foxborough, No. 19-cv-11196-DJC, 2022 U.S. Dist. LEXIS 22102, at *4 (D. Mass. Feb. 7, 2022) (quoting Fed. R. Civ. P. 56(c)(1)(A)). It appears Criterion tried to anticipate an objection under the old rule by submitting an affidavit from its counsel purportedly authenticating the documents (Tab 19). [Arnold Aff. ¶¶ 21-22, ECF No. 28-1]. However, counsel's statement that, "Tab 19 is a true and accurate copy of a document produced by Criterion," would not meet the authentication requirements of Federal Rule of Evidence 901(a) that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is" because counsel does not even state in his affidavit what the documents are purported to be. Fed. R. Evid. 901(a); [Arnold Aff. ¶¶ 21-22].

Still, Fernandes' argument is unavailing for two reasons. First, "although evidence must be capable of authentication at trial, it need not be presented in admissible form in a summary judgment motion." Nasir, 2022 U.S. Dist. LEXIS 22102, at *4 (citing Joseph v. Lincare, Inc., 989 F.3d 147, 155 n.4 (1st Cir. 2021)). Second, Criterion has satisfied the amended requirement of Rule 56 because the assertions about the Covid-19 training are supported by citations to Fernandes' depositions. For example, when asked "if [Tab 19] is the training that you took prior to returning to the Criterion?" in her deposition, Fernandes responded, "Yes, sir. It is, apparently." [Tab 3, L. Fernandes Dep., Vol. II 18:5-24].

The First Circuit has held that where a witness gives a clear and unambiguous answer in a

deposition, "[they] may not defeat summary judgment with a contradictory [assertion] unless he gives a satisfactory explanation of why the testimony has changed." Ziehm v. RadioShack Corp., No. 09-69-P-S, 2010 U.S. Dist. LEXIS 136782, at *6 (D. Me. May 22, 2010) (quoting Thore v. Howe, 466 F.3d 173, 186 n.7 (1st Cir. 2006)). Fernandes provided zero explanation as to why her testimony has changed. In her deposition, she also answered affirmatively as to whether she understood statements from the PowerPoint training, including that if she was having signs of Covid-19, she should "consult a medial professional for guidance and to receive a diagnosis." [Tab 3, L. Fernandes Dep., Vol. II 21:1-23]. Her deposition testimony at a minimum supports Criterion's assertion that Tab 19 is indeed the Covid-19 training that Fernandes participated in, as well as the assertion that she understood statements made in the training presentation. As Fernandes' objection that Tabs 19 is not the training and quiz that she participated in "contradicts the plaintiff's deposition testimony, . . . and [she] provides no satisfactory explanation for the change," Ziehm, 2010 U.S. Dist. LEXIS 136782, at *9, the Court overrules Fernandes' objection to using Criterion's assertions relating to those documents.

## III.   DISCUSSION

### 1.   Count I: Violations of Mass. Gen Laws ch. 151B § 4 and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112

Both the ADA and Chapter 151B require a plaintiff alleging interference to first file an administrative complaint with the Massachusetts Commission Against Discrimination ("MCAD") within 300 days after the alleged unlawful practice occurred. See 42 U.S.C. § 12117(a) (citing 42 U.S.C. § 2000e-5).[7] Because Fernandes filed her MCAD/EEOC complaint on June 1, 2021, only

---

[7] "The MCAD has initial jurisdiction over state and federal claims under the EEOC's deferral policy." Minahan v. Town of E. Longmeadow, No. 3:12-CV-30203-MAP, 2014 U.S. Dist. LEXIS 182105, at *30 (D. Mass. Sep. 11, 2014) rejected by, in part, adopted by, in part, 2015 U.S. Dist. LEXIS 18712 (D. Mass., Feb. 17, 2015) (citing Alston v. Mass., 661 F. Supp. 2d 117, 122 (D. Mass. 2009)). "An employee

those acts that occurred on or after August 5, 2020 – 300 days prior — "may be the basis for liability." See Goldstein v. Brigham & Women's Faulkner Hosp., Inc., 80 F. Supp. 3d 317, 324 (D. Mass. 2015) (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110 (2002)). The Supreme Court has held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges"; however, an employee may use "prior acts as background evidence in support of a timely claim." Morgan, 536 U.S. at 113. The 300-day limitations period may be extended under the continuing violation doctrine, "which effectively serves to renew untimely discrimination claims if a related act occurred within the limitations period." Goldstein, 80 F. Supp. 3d at 323. The continuing violation doctrine "is an equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is 'some violation within the statute of limitations period that anchors the earlier claims.'" Davis v. Lucent Techs., Inc., 251 F.3d 227, 235-36 (1st Cir. 2001) (quoting O'Rourke v. City of Providence, 235 F.3d 713, 730 (1st Cir. 2001)).

Both parties include details about Fernandes' injury and subsequent requests for accommodation in the fall of 2017. Fernandes does not address how these allegations would be actionable for her claims, as they occur well before the 300-day limitations period. Even if Fernandes tried to argue that pre-August 2020 occurrences fall under the continuing violation doctrine because they are anchored to her termination in August 2020, the First Circuit has rejected a similar appeal where a plaintiff sought to connect a more recent incident (wrongful termination)

---

asserting claims in violation of either federal or Massachusetts age discrimination laws must file charges with the MCAD within 300 days after the alleged unlawful employment practice occurred." Id. (citing 42 U.S.C. § 2000e-5(e)(1); 29 U.S.C. § 626(d)(1)(B); Mass. Gen. Laws ch. 151B, § 5).

to an older event (sexual harassment) in order to consider the earlier incident to have been timely filed for exhaustion purposes. See Davis, 251 F.3d at 236. Accordingly, rather than treating those time-barred facts as actionable allegations, the Court considers them only as "background" informing Fernandes' claims. See Morgan, 536 U.S. at 113.

The ADA "prohibits an employer from discriminating against an otherwise qualified individual based on a real or perceived disability." Rios v. Centerra Grp. LLC, 106 F.4th 101, 111 (1st Cir. 2024) (citations omitted). Because Mass. Gen. Laws ch. 151B ("Chapter 151B") "is the 'Massachusetts analogue' to the ADA," Stratton v. Bentley Univ., 113 F.4th 25, 52 n.26 (1st Cir. 2024) (quoting Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 153 (1st Cir. 2009), "federal case law construing the ADA should be followed in interpreting the Massachusetts disability law." Id. (quoting Ward v. Mass. Health Rsch. Inst., 209 F.3d 29, 33 n.2 (1st Cir. 2000)). Therefore, courts "analyze claims under the ADA and Chapter 151B using the same framework." Id. (citing Der Sarkisian v. Austin Preparatory Sch., 85 F.4th 670, 675 (1st Cir. 2023)). When, as is here, there is no direct evidence of discrimination, courts evaluate Chapter 151B § 4 and 42 U.S.C. § 12112 disability discrimination claims using a three-step burden-shifting framework originating from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-07 (1973). Brader v. Biogen Inc., 983 F.3d 39, 54-55 (1st Cir. 2020).

At the first step for both claims, the plaintiff must establish a prima facie case by demonstrating that she (1) was disabled within the meaning of the ADA, (2) was "nonetheless qualified to perform the essential functions of the job, with or without reasonable accommodation," and (3) was terminated "in whole or in part" because of her disability. Der Sarkisian 85 F.4th at 675; Brader, 983 F.3d at 55 (citation omitted).  Next, the burden of production shifts to Criterion to provide a legitimate reason for terminating Fernandes "which, on its face, would justify a

conclusion that the plaintiff was let go for a nondiscriminatory motive." Brader, 983 F.3d at 55 (citation omitted). To survive summary judgment at step three, Fernandes must demonstrate by a preponderance of the evidence that Criterion's "proffered reason is pretextual" and that its actual reason for terminating her is discriminatory. Id. (citation omitted).

The Court assumes arguendo that Fernandes met her initial burden in establishing a prima facie case under both statutes. See Stratton, 113 F.4th at 48-49. (assuming, without deciding, that plaintiff had met her prima facie case in the burden-shifting framework). Next, the Court assesses the legitimacy of Criterion's reason for terminating Fernandes and finds that its reason was not discriminatory. Criterion states it terminated Fernandes for her "failure to comply with the COVID-19 Protocol, her provision of false information on the COVID-19 self-screening attestation, and her lack of judgment in endangering other staff by entering the worksite while awaiting the results of a COVID-19 test and exhibiting symptoms." [Pl. Resp. CSMF ¶ 64]. The Court agrees with the Defendant that "it is quite credible that Criterion would no longer want to employ someone whom it genuinely believed had knowingly exposed all of its employees at a particular facility to a potentially deadly disease, necessitating closure of that facility for two weeks, because the employee had failed to follow the protocols put in place to prevent that very result." [D. Mem. at 14]. Even if Fernandes did not report muscle aches and fatigue on the self-screening checklist because she attributed them to her chronic condition, she also failed to report the other Covid-related symptoms she was experiencing, which her medical records report had begun about a week before her positive test. Further, entering the worksite while symptomatic and awaiting the result of a Covid-19 test – which Fernandes herself requested – did demonstrate a lack of judgment and a degree of recklessness in potentially endangering clients and staff. Accordingly, Criterion has put forth a legitimate, non-discriminatory reason for terminating

Fernandes. The Court will focus its analysis on step three of the McDonnell Douglas framework, where Fernandes must demonstrate that Criterion's reason for terminating her was pretextual. See Brader, 983 F.3d at 55.

Pretext "can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." Id. at 56 (quoting Adamson v. Walgreens Co., 750 F.3d 73, 79 (1st Cir. 2014)). When assessing Fernandes's evidence of pretext, the Court's focus must be on the perception of the employer and whether Criterion believed its reason for termination was credible. Id. (citation omitted). To meet her burden, "it is not sufficient for [Fernandes] 'merely to impugn the veracity of the employer's justification.'" Ray, 799 F.3d at 113 (quoting Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006)). Fernandes must "elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real and unlawful motive of discrimination." Id. (quoting Azimi, 456 F.3d at 246).

Criterion has been consistent throughout the termination process as well as in their court filings that it terminated Fernandes for her lack of judgment and for violating the Covid-19 protocol in the manners described above. Both Criterion's termination letter to Fernandes and its internal emails discussing its decision to terminate are consistent with one another and present the same reasons Criterion offers in its motion for summary judgment. ["Termination Rationale" Letter at 2, ECF No. 28-31; ECF No. 28-29 at 2 (emails discussing the circumstances around Fernandes' Covid-19 exposure); Littleton Aff. ¶ 9; Pl. Resp. CSMF ¶ 64].

As for the implausibility factor, the Court determines that Criterion's stated reasons to terminate Fernandes are plausible. First, in response to Fernandes' potential Covid-19 exposure, Criterion shut down its worksite for two weeks. While Criterion does not offer a specific economic amount lost, it is reasonable to assume that it incurred losses in profit from those weeks as well as potential losses of their clients' trust due to the risk of exposing their children to Covid-19. At a minimum, the contract tracing and worksite closure disrupted Criterion's normal operations and diverted supervisors' attention to determine Fernandes' discipline. Further, given Criterion's heightened state of caution during the pandemic, it is plausible that it would fault Fernandes for her lack of judgment in choosing to present at the worksite while symptomatic and awaiting a Covid-19 test. The First Circuit has held that "courts in employment discrimination cases may not act as 'super personnel departments,' substituting judicial judgments for the business judgments of employers." Arroyo-Audifred, 527 F.3d at 221 (quoting Bennett, 507 F.3d at 32). Criterion made the decision to terminate Fernandes based on her lack of judgment and violation of a company protocol, i.e. her termination was not discrimination but rather discipline for questionable conduct – something the business itself is best suited to decide.

A plaintiff may also demonstrate pretext by showing that she was treated differently than similarly situated employees who did not have disabilities. Rios, 106 F.4th at 114. To do so, "[s]he must show 'that others similarly situated to [her] in all relevant respects were treated differently by the employer.'" Id. (quoting Kosereis v. R.I., 331 F.3d 207, 214 (1st Cir. 2003)). Fernandes argues that she is similarly situated to her co-worker, Maria Rojas. Fernandes must show that Rojas was "subject to the same standards and [] engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish [her] conduct or the employer's treatment of [her] for it." Cocuzzo v. Trader Joe's East Inc., No. 22-10162-LTS, 2023 U.S. Dist. LEXIS

19

155289, at *23 (D. Mass. July 28, 2023) (quoting Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 21 (1st Cir. 1999)). Fernandes asserts that Criterion treated her more harshly than non-disabled Rojas, who Fernandes alleges also violated the Covid-19 protocol. [Pl. Opp. at 9]. Criterion's Covid-19 protocol stipulated that employees should not enter the worksite if they or someone in their household tested positive or was presumed to be positive in the past fourteen days. [ECF 28-19 at 3, 5]. According to Fernandes, Rojas entered the Criterion facility on July 29, 2020 while two members of her household (her sons) were awaiting the results of a Covid test. [Pl. Opp. at 10]. Fernandes alleges "upon information and belief" that Rojas did not report this fact on the Self-Screening Checklist. [Compl. ¶ 33]. Fernandes states that Rojas learned that her sons had tested positive for Covid-19 while she was at work. [Pl. Opp. at 10]. While the timing of when Rojas left from work that day is not certain, the parties do not dispute that Rojas did inform Finnegan of her possible exposure and was sent home to quarantine. There is no information in the record to suggest that Rojas ever tested positive for Covid-19 herself.

The Court finds that Fernandes and Rojas are not "similarly situated . . . in all relevant respects." Rios, 106 F.4th at 114 (quoting Kosereis, 331 F.3d at 214). First, the degree of risk presented by their actions is not the same. It is undisputed that Fernandes came in to work on August 3, 2020 after having gone to urgent care days prior reporting symptoms that are related to Covid-19, and while awaiting a Covid-19 test that she requested after being in close contact with Rojas. [Pl. Resp. CSMF ¶¶ 56-57]. It is likewise undisputed that Fernandes did not report her symptoms of sore throat and gastrointestinal issues on her self-screening checklist. On the other hand, Rojas was not herself positive or suspected positive for Covid-19 and did not receive a positive test result at work. First-person contact with an individual that is herself Covid-19 positive presents a greater and more certain health risk than contact with someone who is not themselves

positive, even if that person has a household member who is positive.[8] It is plausible that Criterion determined that a more intensive response was required to respond to the heightened first-person risk that Fernandes posed compared, whereas Rojas' second-hand exposure only required Rojas to quarantine.

The question of pretext hinges on the perception of the employer, Brader, 983 F.3d at 56, and Criterion did not have information that would indicate that Rojas' situation demanded the same response as Fernandes'. Fernandes herself states that Rojas found out that her household members had tested positive for Covid-19 after she was already at work, meaning Rojas did not violate Criterion policy by presenting at work and not disclosing her household members' positive status. Fernandes does not address the discrepancy of how Rojas purportedly falsified her self-screening checklist, which is filled out upon arrival, by omitting her household members' status when she did not yet know her sons were positive when she arrived at work on July 29, 2020. Instead, Fernandes asserts that Rojas' sons were presumptively positive because they were awaiting test results. Criterion asserts it has "no information" to suggest Rojas entered a Criterion worksite while suffering from symptoms of Covid-19, "no information" to suggest that Rojas entered the worksite while awaiting the results of a Covid-19 test she had taken, "no information" to suggest Rojas ever submitted false information to Criterion management concerning a Covid-19 screening checklist. [Finnegan Aff. ¶¶ 7-9]. What Criterion did know is that Rojas informed

---

[8] In her complaint, Fernandes asserts that after she was fired and following an antibody test, on August 27, 2020, she learned from her doctor that she did not have antibodies for Covid-19 and the most likely reason for the discrepancy was that her original Covid-19 test was a false positive. [Compl. ¶¶ 60-61]. Fernandes states she informed Criterion that she likely never had Covid-19, but even if these allegations were supported by admissible evidence, it would not change the Court's calculus. Criterion's decision was based on Fernandes' lack of judgment knowing what she did at the time of her actions leading up to her termination.

supervisors on July 29, 2020, that she was a close contact to someone who had tested positive for Covid-19, she was told she needed to quarantine, and she proceeded to do so. [Id. ¶ 3].

To determine "whether an individual is a sufficiently similar comparator" courts consider "not whether their circumstances are identical, but on whether they are similar in all relevant aspects" and "whether a prudent person, looking objectively at the incidents, would think them roughly equivalent." Downey v. Johnson, No. 22-P-106, 2024 Mass. App. LEXIS 87, at *21-22 (Mass. App. Ct. July 3, 2024) (citations omitted). Rojas' and Fernandes' circumstances are quite different in relevant and material ways. Criterion determined that Rojas' and Fernandes' respective conduct necessitated different responses and therefore, it is reasonable that each was treated differently.  Because Rojas is not truly a similarly situated comparator, Criterion's treatment of her compared to its treatment of Fernandes does not demonstrate pretext.

Not only are Fernandes' and Rojas' situations markedly different from one other, even if the Court were to view them both as violations of Criterion's Covid-19 protocol broadly, Fernandes cannot rely on Criterion's decision not to terminate Rojas as evidence of pretext because Criterion did not have any uniform policy governing response actions to when an employee violated the protocol. The First Circuit has noted, "[e]vidence that [the employer] 'deviated from its standard procedure or policies in taking an adverse employment action against [a plaintiff] may be relevant to the pretext inquiry.'" Taite v. Bridgewater State Univ., Bd. of Trs., 999 F.3d 86, 96 (1st Cir. 2021) (quoting Theidon v. Harvard Univ., 948 F.3d 477, 499 (1st Cir. 2020)). "The rationale is that if an employer has a policy or procedure that governs a specific situation but fails to adhere to the same in taking an adverse employment action . . . , then it might be inferred that the reason articulated for taking the adverse employment action against the employee was not true." Taite, 999 F.3d at 97 (citations omitted). However, it follows that if the employer does not

have a policy or procedure governing a specific situation, any variation in the employer's actions from one individual to another in said situation is not indicative of pretext.

In his affidavit, Dr. Robert Littleton (founder, President, and Chief Executive Officer of Criterion), detailed how Criterion developed Covid-19 protocols "to allow its employees to return to work while remaining as safe as practicable and minimizing the spread of COVID-19." [Littleton Aff. ¶ 5, ECF No. 28-3]. Dr. Littleton describes the protocol as requiring, "amongst many other things pertaining to hygiene, masking, social distancing, sanitation, and other topics;" that staff complete the Covid-19 training; and that staff complete the daily self-screening checklist. [Id. ¶ 6]. "Staff with any 'yes' responses on the self-screening checklist were not to enter the facility and were to contact the Program Director to review symptoms and conditions *so that an assessment could be made*." [Id. (emphasis added)]. Dr. Littleton's affidavit contains no information as to what Criterion's protocol would be if an employee did show up to work with Covid-19 symptoms or exposure other than that "an assessment" would be made. Dr. Littleton states that Criterion's Covid-19 protocol was "based on governmental health guidance" and that the protocol "evolved throughout the course of the pandemic to reflect contemporary governmental health guidance and emerging best practices." [Id. ¶ 5]. Shawna Jones' deposition reflects that in the event of a positive Covid-19 exposure at Criterion's worksite, Criterion would "follow standard CDC protocol" but that "every case was honestly different" and in practicality, any possible exposures were handled on a "case by case" basis. [Jones Dep. 38:5-39:20]. In following CDC guidance, it is clear that Criterion's Covid-19 protocols primarily related to health and safety rather than employee discipline. Further, the situation Fernandes presented was one that Criterion had not experienced before. [Pl. Resp. CSMF ¶¶ 61-62 (It is undisputed that "[t]hat was the first time someone had reported that they had received a positive test result while in the office," and "[a]t no

other time, before or since, has Criterion needed to shut down a facility completely because of an individual's actions.")].

Criterion had defined and standard policies regarding minimizing the spread of Covid-19 and maintaining a safe and sanitary workplace, but it did not have a uniform policy regarding employee discipline for violating the Covid-19 policies. Further, Criterion had no uniform policy to address a potential Covid-19 exposure at the worksite. Because response actions in Fernandes and Rojas' situations were determined on a "case by case" basis, that Criterion investigated and terminated Fernandes but not Rojas is neither remarkable nor evidence of pretext.

Fernandes also asserts that Criterion's investigation before making the decision to terminate her was inadequate, biased, and unreasonable, and quotes Sociedad Espanola de Auxilio Mutuo y Beneficiencia v. N.L.R.B., in stating, "the conducting of an inadequate investigation of (or a complete failure to investigate) the incident upon which the employer relied as grounds for discharge can support a finding of discriminatory motive." 414 F.3d 158, 163 (1st Cir. 2005) (citation omitted); [Pl. Opp. at 12].

The record reflects, and the parties agree, that Criterion management did engage in an investigation following Fernandes' appearance at the worksite on August 3, 2020 and receipt of her positive Covid-19 test while there. The same day, August 3, 2020, Jones called Fernandes for contact tracing purposes. [Pl. Resp. CSMF ¶ 58]. Here the Court pauses to note that Fernandes and Jones recount their discussion in similar ways, however they differ on the impressions of the other person and the conclusions the other made. Further, the Court declines to engage in a "she said vs. she said" dispute about credibility because neither Fernandes' nor Jones' statements are admissible – both are hearsay.[9] Additionally, Jones' summary of her call with Fernandes as appears in an

---

[9] The disagreement about what was said on the call between Jones and Fernandes does not create a genuine dispute of material fact because "[a] genuine issue of material fact can be created only by materials of

email chain with Criterion management is likewise inadmissible as double hearsay. [See ECF No. 28-29]. "'It is black-letter law that hearsay evidence cannot be considered on summary judgment' for the truth of the matter asserted." Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) (quoting Dávila v. Corporación de P.R. para la Difusión Pública, 498 F.3d 9, 17 (1st Cir. 2007)).  Accordingly, the only admissible fact before the Court is that Criterion did engage in some level of investigation and subsequently closed operations for two weeks and terminated Fernandes. Even if the Court were to credit deposition testimony describing the call and conclude that Jones did characterize Fernandes' unreported symptoms as new rather than chronic, Jones' decision does not lead to the conclusion that she did so due to a discriminatory animus as opposed to a heightened sense of caution during the pandemic. Moreover, while an inadequate investigation "*can support a finding of discriminatory motive,*" it in and of itself is not determinative in finding that an employer harbored a discriminatory motive. Sociedad Espanola, 414 F.3d at 163. Given the limited admissible information the Court has before it on the adequacy of the investigation combined with the non-dispositive nature of this point, the Court is not persuaded that Criterion's investigation proves Fernandes' termination was pretextual.

As Fernandes has failed to meet her burden in demonstrating pretext, the Court **GRANTS** summary judgment on Count I.

2. **Count II: Interference under Mass. Gen Laws ch. 151B § 4(4A) and the ADA, 42 U.S.C. § 12203(b)**

Fernandes' second claim is that Criterion interfered in the exercising of her rights under Chapter 151B and the ADA, which prohibit the "interfere[nce] with any individual in the exercise or enjoyment of… any right granted or protected by this chapter." 42 U.S.C. § 12203(b); Chapter

---

evidentiary quality." Hannon, 645 F.3d at 49 (citation omitted).

151B § 4(4A). To survive summary judgment on an ADA interference claim, Fernandes must prove that (1) she was engaged in an activity protected by the ADA; (2) Criterion interfered on account of her protected activity; and (3) Criterion was motivated by an intent to discriminate. Post v. Health-Michigan, No. 18-CV-13773, 2021 WL 3269058, at *4 (E.D. Mich. July 30, 2021), aff'd sub nom. Post v. Trinity Health-Michigan, 44 F.4th 572 (6th Cir. 2022). To prove a violation of § 12203(b), "a plaintiff must show that when the interference, coercion, or intimidation took place they were exercising or enjoying a right protected by the ADA." Lath v. Austin, No. 22-11158-NMG, 2023 U.S. Dist. LEXIS 136643, at *9 (D. Mass. Aug. 7, 2023) (quoting Tassinari v. Salvation Army Nat'l Corp., 610 F. Supp. 3d 343, 361 n.16 (D. Mass. 2022)). Similarly, to be successful in her Chapter 151B § 4(4A) interference claim, Fernandes must prove that Criterion "interfered with [her] rights in deliberate disregard of those rights which requires a showing of an intent to discriminate." Coogan v. FMR, LLC, 264 F. Supp. 3d 296, 309 (D. Mass. 2017) adopted by Coogan v. FMR, LLC, No. CV 15-13148-GAO, 2018 WL 4405614, at *10 (D. Mass. Sept. 17, 2018) (citation omitted). Courts have identified that the protected activity in an interference claim is the "requesting a reasonable accommodation for a disability . . . at the time the alleged interference occurred." Menoken v. Burrows, 656 F. Supp. 3d 98, 107 (D.D.C. 2023) (citation omitted).

Fernandes supports her claim for interference largely with incidents occurring in September and October 2017, when she submitted her requests for accommodation relating to her back injury. [Pl. Opp. at 15-16]. She further alleges that Criterion staff members made comments in March 2019 that Fernandes interpreted as threats that she would be terminated if she requested an accommodation. [Id. at 16] As stated above, these allegations are not independently actionable because they occurred well before the 300-day limitations period permitted by the ADA and

Chapter 151B.[10] The Court has already concluded that the continuing violations doctrine would not permit Fernandes to use her termination as an anchor to make her allegations of events in 2017 and 2019 actionable. See discussion of Count I, *supra*; see Davis, 251 F.3d at 236. Unlike with Count I, here, Fernandes is utilizing the earlier allegations as actionable proof of interference rather than mere background as she did for her discrimination claim. As a result, Fernandes' proffered proof for her interference claim is time-barred. Further, the law requires that the employer's interference occur while the employee is exercising or enjoying a right protected by the ADA (here, requesting an accommodation or working under an accommodation). See Lath, 2023 U.S. Dist. LEXIS 136643, at *9. Fernandes does not remember ever requesting another accommodation after October 27, 2017. [Pl. Resp. CSMF ¶ 25]. To the extent Fernandes alleges that her termination is proof of interference, the Court has already found that Criterion did not act with an intent to discriminate when it fired Fernandes. Without actionable evidence to support her claim that Criterion interfered with her right to seek accommodations or work with accommodations within the limitations period, Fernandes' claim fails as a matter of law. Summary judgment is **GRANTED** as to Count II.

3. **Count III: Retaliation under Mass. Gen Laws ch. 151B § 4(4) and the ADA, 42 U.S.C. §12203(a)**

Fernandes' third claim is for retaliation under Chapter 151B §4(4) and the ADA, 42 U.S.C. §12203(a). The Court analyzes these state and federal statutes using a similar burden shifting framework as above. Wright v. CompUSA, Inc., 352 F.3d 472, 478 (1st Cir. 2003). Retaliation is a separate claim under the ADA and "does not depend on the success of the plaintiff's disability

---

[10] The Court reiterates that since Fernandes filed her MCAD/EEOC complaint on June 1, 2021, only those acts that occurred on or after August 5, 2020 - 300 days prior — "may be the basis for liability." See Goldstein, 80 F. Supp. 3d at 324 (citing Morgan, 536 U.S. at 110).

claim." Guzmán-Rosario v. UPS, Inc., 397 F.3d 6, 11 (1st Cir. 2005) (citing Wright, 352 F.3d at 477-78). Such a claim "is usually made by one who requests an accommodation or complains about a refusal to accommodate and is then punished for the request or the complaint." Id. The First Circuit requires a plaintiff asserting retaliation to first establish a prima facie claim by showing that she "was engaged in protected conduct, that [s]he was discharged, and that there was a causal connection between the discharge and the conduct." Wright, 352 F.3d at 478 (citation omitted). As in Wright, Fernandes' request for accommodation constituted protected activity, and it is undisputed that she was discharged. Therefore, "the causal connection between [her] discharge and [her] request for accommodation is the contested issue." Id.

In order to establish a causal connection between Fernandes requesting accommodations and being fired, she must show a nexus between the two. See id. Causation can be shown by proving that "the employer's knowledge of the protected activity was close in time to the employer's adverse action." Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir.1994). "[A] showing of discharge soon after the employee engages in an activity specifically protected by . . . [the ADA] . . . is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation." Calero-Cerezo v. U.S. Dep't of Just., 355 F.3d 6, 25 (1st Cir. 2004) (citation omitted). However, the First Circuit has held that any temporal proximity three months or longer would be "too long a gap to permit by itself an inference of causation." Rios, 106 F.4th at 120 (citation omitted). Any period longer than three months or approaching twelve months between requesting accommodations and being discharged would *weigh against* a finding of causality. Colón-Fontánez v. Mun. of San Juan, 660 F.3d 17, 43 (1st Cir. 2011) (emphasis added).

After Fernandes establishes her prima facie case of retaliation, the burden shifts to Criterion to "articulate a legitimate, nondiscriminatory reason for its employment decision." Wright 352

F.3d at 478 (citation omitted). If Criterion satisfies their burden, then Fernandes must demonstrate "that the employer's proffered reason is pretext masking retaliation." Id. (citation omitted).

Fernandes' third claim fails for two reasons. First, too much time has passed between Fernandes' requesting accommodations in September 2017 and her termination in August 2020 for the Court to infer that she was discharged in retaliation for requesting accommodations or seeking benefits. See Colón-Fontánez, 660 F.3d at 43. Second, as discussed above, even if Fernandes could establish her prima facie case, Criterion has met its burden to articulate a legitimate non-discriminatory, non-retaliatory reason for firing her. Fernandes has not alleged sufficient facts to demonstrate that Criterion's reason was pretextual in any way – whether as pretext for disability discrimination or retaliation. Accordingly, summary judgment is **<u>GRANTED</u>** as to Count III.

4. **<u>Count IV: Violations of the Massachusetts Workers' Compensation Act, Mass. Gen. Laws ch. 152 § 75B</u>**

Fernandes alleges that Criterion fired her for exercising her workers' compensation rights in both filing her workers' comp. claim and receiving benefits. [Pl. Opp. at 17]. Mass. Gen. Laws. ch. 152, § 75B(2) makes it unlawful for an employer or its agent to discharge or discriminate against an employee because the employee has exercised a right afforded by the Workers' Compensation Act.  To establish her prima facie case, Fernandes must show that "1) [s]he engaged in an activity protected by the Workers' Compensation Act, 2) the defendant was aware of that protected activity, 3) the defendant thereafter took an adverse employment action against the plaintiff and 4) but for the plaintiff's activity the defendant would not have taken such an adverse employment action. Canfield v. Con-Way Freight, Inc., 578 F. Supp. 2d 235, 242 (D. Mass. 2008) (citing Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 177 n.5 (1st Cir. 2003)).

Regarding the first element, the record clearly shows that Fernandes was engaged in an activity protected by the Workers' Compensation Act, namely filing for and utilizing benefits. Additionally, as to the third element, Fernandes' termination was an adverse employment action.

Regarding the second element, the record demonstrates that Criterion was aware of Fernandes' protected activity. Criterion's awareness was not limited to the time of the initial filing of her workers' compensation claim, but also, as Fernandes points out, Criterion was aware that Fernandes had an active workers' compensation claim around the time of her termination.[11] In May 2020, a human resources employee, Keri Mitchell, emailed Finnegan to ask whether Fernandes had reported a new injury in April 2020 relating to her workers' compensation claim, as an insurance adjuster had requested that information from Mitchell. [See ECF No. 31-6]. Fernandes asserts Finnegan's tone in the emails is "hostile," [Pl. Opp. at 18], but the Court notes Fernandes has selectively quoted portions of Finnegan's words, which, when viewed in entirety, do not create an impression of hostility. Finnegan appears to be answering the questions asked of her. For example, Finnegan is asked whether Fernandes has made "[a]ny complaints recently?", to which she responded, "[s]he complains all the time of her back hurting but I do not recall any report of additional injury." [ECF No. 31-6 at 2]. The only reasonable inference in favor of Fernandes is that the cited emails establish that Criterion was aware that Fernandes had an ongoing workers' comp. claim.

Fernandes can establish the first three elements of her claim, but she has not alleged sufficient facts to indicate that "but for" her use of workers' comp. benefits, Criterion would not have fired her. Just as Fernandes has failed to show causation with regard to her discrimination claims, Fernandes similarly cannot meet her burden on the fourth element of her workers'

---

[11] It matters little whether this claim was a new claim or Fernandes' original claim that she reopened.

compensation retaliation claim. First, there is no dispute that Fernandes herself testified that she does not believe she was fired for *filing* workers' comp. benefits in 2017, stating in her deposition, "if they wanted to [fire me for filings for workers' comp benefits], they -- they would have done that right when this happened. They wouldn't have waited three years later to do it." [Tab 3, L. Fernandes Dep., Vol. II 62:9-14]. Fernandes does little to dispute this testimony, asserting only "Criterion's state of mind and motivation for terminating Fernandes's employment is a question for the jury." [Pl. Resp. CSMF ¶ 73]. Fernandes also fails to effectively address this testimony in her briefs.

Second, to the extent that Fernandes is asserting that she was fired for continuing to receive workers' compensation benefits, there is scant evidence in the record to support that claim. When stripped of Fernandes' editorializing, Criterion management's statements simply do not indicate that her workers' compensation claim had anything to do with her termination. The May 2020 emails are not only benign responses to a legitimate human resources inquiry, they also occurred three months before Fernandes was terminated. Fernandes emphasizes that causation can be found in an August 7, 2020 email from Criterion agent Keri Mitchell to the insurance adjuster who had originally inquired about whether Fernandes had any new injuries regarding her workers' compensation claim. [ECF No. 31-13]. Mitchell's email is three lines with only one complete sentence that reads, "Just wanted to follow up on the status of this re-opened claim." [Id. at 2]. Fernandes states the timing of the email on August 7, 2020 – after notice of Fernandes' positive Covid-19 test, but prior to the decision to terminate Fernandes' employment – demonstrates that "the status of Fernandes's [sic] [workers' compensation] claim was considered in making that determination." [Pl. Opp. at 18]. That the status of Fernandes' claim was potentially considered or relevant, does not call for the conclusion that it was the "but for" cause of her termination. As the

Court has noted, Criterion has demonstrated that it had a legitimate, non-discriminatory, non-retaliatory reason for firing Fernandes that was unrelated to her exercise of rights under the Workers' Compensation Act.

The First Circuit has made clear that it is not the Court's "responsibility to dig through the record in the hopes of unearthing some nugget that creates a genuine dispute of material fact." Delgado Echevarría v. AstraZeneca Pharm. LP, 856 F.3d 119, 137 (1st Cir. 2017). Fernandes' own uncontroverted testimony disclaiming one basis for her claim (the filing of workers' compensation benefits), combined with the utter lack of direct or circumstantial evidence on the second basis for her claim (utilizing workers' compensation benefits), Fernandes has failed to demonstrate the element of causation and the Court **GRANTS** summary judgment on Count IV.

5. **Count V: Violations of the Massachusetts Wage Act, Mass. Gen. Laws ch. 149 § 148**

Fernandes's final claim is that Criterion violated the Massachusetts Wage Act when it did not pay her 80 hours of accrued sick time upon termination. [Compl. ¶¶ 54-56]. As previously mentioned, Fernandes conceded that Criterion did pay out her sick time; however, she alleges for the first time in her opposition brief that the payment was unlawfully late. [Pl. Opp. at 19]. It is well established that plaintiffs "may not 'raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment.'" Miranda-Rivera v. Toledo-Dávila, 813 F.3d 64, 76 (1st Cir. 2016) (quoting Calvi v. Knox Cty., 470 F.3d 422, 431 (1st Cir. 2006)). As a result, the Court declines to consider any argument as to the timeliness of the sick time payout.

Regarding Fernandes' original claim that Criterion did not pay out her accrued sick time at all, employers are not required to compensate employees for unused sick time. See Mass. Gen. Laws ch. 149, § 148C(d)(7); Rossman v. Nashoba Reg'l Sch. Dist., No. 3:21-CV-40042-KAR,

2024 WL 3966619, at *7 (D. Mass. Aug. 28, 2024) (quoting <u>Tze-Kit Mui v. Mass. Port Auth.</u>, 89 N.E.3d 460, 463 (Mass. 2018)) ("because an employee may use accrued sick time under appropriate conditions, i.e., illness, but may 'lose' it if not used, unused accrued sick time cannot be a wage [under the Massachusetts Wage Act], even where the employer had a policy allowing employees to collect unused sick time upon their departure."). Therefore, even under the most generous interpretation of Fernandes' allegations, her claim fails as a matter of law. Accordingly, summary judgment is **<u>GRANTED</u>** as to Count V.

## IV. <u>CONCLUSION</u>

For the reasons stated above, Court **<u>GRANTS</u>** summary judgment in favor of the Defendant on all counts and the case is **<u>DISMISSED</u>**.


**SO ORDERED.**

Dated: September 30, 2024

      /s/ Margaret R. Guzman
Margaret R. Guzman
United States District Judge